# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

JEREMY R.[1],

|                          |                             |
| ------------------------ | --------------------------- |
| Plaintiff,               |                             |
| v.                       | Case No. 3:19-cv-00313-SLG  |
| ANDREW SAUL,             |                             |
| Commissioner of Social Security, |                     |
| Defendant.               |                             |

## DECISION AND ORDER

On June 11, 2018, Jeremy R. ("Plaintiff") filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"),[2] alleging disability beginning April 1, 2013.[3]  Plaintiff has exhausted his administrative remedies and filed a Complaint seeking relief from this

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought claims under Title II and Title XVI.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs.  *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") .192, 198.  Plaintiff, through counsel, amended his alleged disability date to December 1, 2016.  A.R. 15, 34.

Court.[4]  Plaintiff filed his opening brief seeking remand for payment of benefits.[5]  The Commissioner filed a brief requesting remand for further proceedings.[6]  Plaintiff filed his reply on September 17, 2020.[7]  Oral argument was not requested and was not necessary to the Court's decision.  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8]  For the reasons set forth below, Plaintiff's request for relief will be granted in part.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11]  In reviewing the agency's determination, the Court considers the

---

[4] Docket 1 (Plaintiff's Compl.).

[5] Docket 21 (Plaintiff's Br.).

[6] Docket 25 (Defendant's Br.).

[7] Docket 26 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]

## II.  DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[17] In addition, Supplemental Security Income (SSI) may be

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] 42 U.S.C. § 423(a).

available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[18]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[19]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[20]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[21]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[22]  If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[23]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational

---

[18] 42 U.S.C. § 1381a.

[19] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[20] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[21] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[22] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[23] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[24] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[25] *The ALJ determined that Plaintiff had not engaged in substantial activity since December 1, 2016, the amended alleged onset date.*[26]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[27] *The ALJ determined that Plaintiff had the following severe impairment: rheumatoid arthritis.*[28]

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[29] *The ALJ determined that Plaintiff did not have an impairment or combination of*

---

[24] *Tackett*, 180 F.3d at 1101.

[25] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[26] A.R. 17.

[27] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[28] A.R. 17.

[29] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

*impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.*[30]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[31] *The ALJ determined that Plaintiff would have had the residual functional capacity to perform light work except Plaintiff was limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally; standing, walking, and sitting six hours during an eight-hour workday; occasionally pushing/pulling bilaterally and operating foot controls; frequently climbing ramps or stairs; frequently balancing; occasionally stooping, kneeling, crouching, crawling, and climbing ladders, ropes, or scaffolds; avoiding moderate exposure to extreme cold, wetness, humidity, and excessive vibration; and avoiding concentrated exposure to extreme heat, irritants, and hazardous machinery.*[32]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[33]

---

[30] A.R. 18.

[31] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[32] A.R. 18.

[33] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that Plaintiff was capable of performing his past relevant work as a Landscape Foreman.*[34]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[35] *The ALJ determined that, in addition to Plaintiff being capable of performing past relevant work, other jobs existed in the national economy that he was able to perform, including basket filler, basic assembler, and garment sorter.*[36]

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from December 1, 2016 through July 31, 2019, the date of the ALJ's decision.[37]

### III. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1988.[38] Plaintiff reported working until March 2013. He reported last working as a shed fabricator. In the past, he reported working as a laborer and foreman for a lawn care, landscaping, and snow removal company; and as a steward, cook, and mechanic at Alyeska Ski Resort. He also reported serving in the military as a vehicle mechanic. He has a high school degree and some college level education.[39] On

---

[34] A.R. 23.

[35] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[36] A.R. 25.

[37] *Id.*

[38] A.R. 192, 198.

[39] A.R. 231, 54–56.

or about July 16, 2018, the Social Security Administration ("SSA") initially determined that Plaintiff was not disabled under the applicable rules.[40] On June 14, 2019, Plaintiff testified, with representation, at a hearing before ALJ Cecilia LaCara.[41] The ALJ issued an unfavorable ruling on July 31, 2019.[42] The Appeals Council denied Plaintiff's request for review on October 24, 2019.[43] On December 16, 2019, Plaintiff filed his Complaint; he is represented by counsel in this appeal.[44]

*Medical Records and Medical Opinion Evidence*

The Court's summary of the medical evidence focuses on the time period between December 1, 2016 and July 31, 2019. However, the following are the relevant records before December 1, 2016:

On November 2, 2009, Plaintiff saw Grayson Westfall, M.D., for worsening joint pain in the preceding month and associated weight loss. Dr. Westfall diagnosed Plaintiff with rheumatoid arthritis and recommended follow up with a rheumatologist in Anchorage.[45]

On November 7, 2012, Plaintiff saw Dr. Botson for follow up for seronegative rheumatoid arthritis. Dr. Botson recorded Plaintiff's medical history. He noted that Plaintiff was diagnosed with rheumatoid arthritis in 2009 with symptoms of migratory

---

[40] A.R. 91.

[41] A.R. 47–58.

[42] A.R. 12–25.

[43] A.R. 1–5.

[44] Docket 1.

[45] A.R. 393–97.

swelling and pain of the knees and ankles, then later involving the right elbow, bilateral wrists and metacarpophalangeal joints of the hand. Dr. Botson also noted that in 2009, Plaintiff started prednisone, hydroxychloroquine, and methotrexate "which did improve his symptoms, although not completely." Plaintiff then started Enbrel,[46] saw improvement, and was taken off hydroxychloroquine and prednisone. Plaintiff was able to taper off Enbrel until Fall 2011, when he discontinued Enbrel. Dr. Botson noted that Plaintiff's symptoms returned after 1-2 months and he restarted Enbrel. Plaintiff was doing well until he was hospitalized for right hand cellulitis in February 2012. Plaintiff then initiated care with Dr. Botson.

At the November 7, 2012 visit, Dr. Botson noted that Plaintiff's last appointment was August 28, 2012, and that Plaintiff had "mostly done well" since that last appointment. Plaintiff reported that he had "really no symptoms from his rheumatoid arthritis," that methotrexate gave him some nausea, and he occasionally used naproxen if his joints were acting up. Plaintiff also reported recently going to the emergency department for an episode of lower chest, upper abdominal right-sided pain. Dr. Botson opined that with regards to Plaintiff's abdominal symptoms, he did "not know what to make of" them. On physical examination, Dr. Botson observed that Plaintiff's joints were "unremarkable in regards to warmth, tenderness, swelling or decreased range of motion." Dr. Botson opined that, at the time of the November 2012 appointment, Plaintiff had "complete, or if

---

[46] Etanercept (Enbrel) is "a drug that reduces the signs and symptoms of moderate to severe rheumatoid arthritis (RA), such as joint swelling, pain, fatigue, and length of morning stiffness." https://www.hopkinsarthritis.org/paitient-corner/drug-information/etanercept-enbrel.

not complete, a substantial response from his current medications" and that he did "not see any reason that [Plaintiff could not] be gainfully employed in certain jobs."[47]

From January 28, 2013 through August 1, 2013, Plaintiff followed up with Dr. Botson.  Plaintiff reported doing well on a combination of Enbrel and methotrexate.  On physical examination, Dr. Botson observed normal joints and a normal range of motion.[48]

On November 6, 2013, Plaintiff saw Dr. Botson.  He reported side effects with methotrexate and that he had discontinued methotrexate after the appointment on August 1, 2013.  Plaintiff reported he had no symptoms until a few weeks before the appointment.  He reported swelling of the bilateral knees and rashes on the hands.[49]

From approximately May 6, 2014 through June 19, 2015, Plaintiff followed up with Dr. Botson.  He reported stretching his Enbrel doses out due to cost concerns and taking hydrocodone or Vicodin for joint pain.[50]

On August 17, 2016, Plaintiff saw Dr. Botson.  He reported being off Enbrel for "nearly a year" without joint pain, swelling, stiffness, or active inflammation.  He also reported that he was able to resolve stiffness or aches with Advil and that his chronic rashes had improved "over the last 6 months."  He reported using up to six tablets of Vicodin per day for chronic aches.  On physical examination, Dr. Botson observed that

---

[47] A.R. 366–71.

[48] A.R. 352– 65.

[49] A.R. 347–51.

[50] A.R. 333–343.

Plaintiff's joints were "unremarkable in regards to warmth, tenderness, swelling or decreased range of motion."[51]

The following are the relevant records after December 1, 2016:

On May 31, 2017, Plaintiff saw Dr. Botson for follow up for seronegative rheumatoid arthritis. Dr. Botson noted that Plaintiff's last appointment was August 17, 2016 and at that time, Plaintiff "was doing well without any disease modifying agents" and had "no signs of active [rheumatoid arthritis]." However, Plaintiff reported that in mid-May 2017, he began to experience increasing joint swelling and morning stiffness with the worst areas being his wrists, knees, elbows, and hands. He also reported "very intermittent" muscular chest pain. Dr. Botson noted clinical evidence of systemic inflammation, including decreased range of motion and swelling of the elbows, left knee, hands and wrists, and increasing rashes on the bilateral forearms "consistent with disease activity." Dr. Botson restarted Plaintiff's Enbrel prescription and recommended continuing Vicodin for pain on an as-needed basis.[52]

On November 29, 2017, Plaintiff followed up with Dr. Botson. He reported "intermittent joint pains in the wrists, shoulders, and ankles." Plaintiff reported that Enbrel was "completely resolving" his symptoms within one day and that it helped from a few days up to two weeks, but that he also experienced headaches and missed multiple doses because he felt "overmedicated" following Enbrel injections. Dr. Botson observed soft tissue swelling in the right third metacarpophalangeal joints (MCP) and left second and

_____

[51] A.R. 324–28.

[52] A.R. 320–22.

third MCP and swollen elbows bilaterally with decreased range of motion. Dr. Botson adjusted Plaintiff's medications, started Plaintiff on Xeljanz[53] and continued Vicodin on an as-needed basis.[54]

On February 28, 2018, Plaintiff saw Dr. Botson. He reported continued joint pains, primarily involving his bilateral hands, wrists, shoulders, and ankles with morning stiffness lasting up to one hour. Dr. Botson's 14-system review was positive for chest pain, generalized weakness, abnormal sleep patterns, abdominal pain, joint pain, muscle weakness, morning stiffness, and joint swelling. Dr. Botson observed soft tissue swelling in the right third MCP and left second and third MCP; intermittent pain of the right wrist; full range of motion at the bilateral wrists; bilaterally swollen elbows with decreased range of motion; and grossly normal strength. Dr. Botson recommended discontinuing Enbrel, continuing Xeljanz as prescribed, and using Vicodin on an as-needed basis. Dr. Botson also referred Plaintiff to gastroenterology for evaluation and treatment.[55]

On March 5, 2018, Plaintiff's Vectra DA score of 64 indicated high disease activity.[56]

On April 10, 2018, Plaintiff followed up with Brandy Atkins, DNP, at Orthopedic Physicians Alaska. He reported side effects with the use of Xeljanz, including "cold

---

[53] Xeljanz is used for the treatment of adults with moderately to severely active rheumatoid arthritis who have had an inadequate response or intolerance to methotrexate. https://www.drugs.com/pro/xeljanz.html.

[54] A.R. 316–18.

[55] A.R. 311–14.

[56] A.R. 383. Vectra DA assesses rheumatoid arthritis disease activity and is used to categorize the activity as low, moderate, or high. https://www.labcorp.com/provider-services/programs/rheumatoid-arthritis-services.

sweats, tingly skin, and nausea." He reported chronic pain and a grinding sensation in his bilateral shoulders; bilateral wrist pain; and chronic swelling of the third MCPs. The 14-point review of systems conducted by DNP Atkins was positive for generalized weakness, joint pain, muscle weakness, morning stiffness, and joint swelling. DNP Atkins observed swelling in the right third MCPs and left third MCPs; swelling at the dorsal right wrist; no swelling or pain of the bilateral elbows and shoulders; a positive Hawkins test on the right; and mild diminished rotation of the neck to the right. DNP Atkins noted that Plaintiff's shoulder pain was "likely related to his uncontrolled RA (rheumatoid arthritis)" and that his physical exam showed impingement syndrome. She also noted that at least some of Plaintiff's bilateral wrist pain and swelling was likely related to his rheumatoid arthritis. DNP Atkins recommended continuing with Xeljanz and Vicodin; trying prednisone; starting physical therapy for his acute neck pain and chronic bilateral shoulder pain; and seeing a hand specialist.[57]

On May 16, 2018, Plaintiff saw Dr. Botson. He reported "persistent symptoms" despite taking Xeljanz as prescribed. He reported symptoms in the hands bilaterally and "multiple additional joint aches like he was 'hit by a bus.'" On physical examination, Dr. Botson observed pain on examination and swelling of the right hand third and fifth MCPs; ache across the interphalangeal joints of the hand (PIP) bilaterally; a large Baker's cyst of the right knee with otherwise normal bilateral knee range of motion; bilateral ankle swelling; tenderness at the bilateral sternoclavicular junction; and no decreased range of motion of the shoulders. Dr. Botson noted that Plaintiff's "[l]abs at the last appointment

---

[57] A.R. 306–09.

did show elevated inflammatory markers and disease activity by Vectra DA."  Plaintiff reported that prednisone treatments were not helpful, but that ibuprofen and hydrocodone were somewhat helpful.  Dr. Botson discontinued Xeljanz and recommended starting Simponi infusions.[58]

On June 6, 2018, Plaintiff saw Dr. Botson.  Plaintiff reported that he had not being doing well.  He reported that he received a Simponi infusion on May 24, 2018 and reported that the infusion was very helpful for his symptoms, but only for a few days.  He reported continued use of Vicodin on an as-needed basis.  He reported having difficulty making a fist and completing activities of daily living.  Plaintiff also reported pain in the left wrist, right ankle, and bilateral shoulders.  Dr. Botson observed pain and swelling of the right hand at the third and fifth MCPs, bilateral PIP joints, and "continued difficulties making a fist in the right hand."  He observed left wrist swelling and a Baker's cyst of the right knee, but otherwise normal bilateral range of motion in the knees.  He observed tenderness at the bilateral sternoclavicular junction.  Dr. Botson noted that Enbrel "had previously been helpful, but [Enbrel] began to lose efficacy and create side effects."  He recommended that Plaintiff proceed with a second Simponi infusion in late June 2018.[59]

On July 1, 2018, the agency medical consultant, Jay Caldwell, M.D., provided an RFC.  He noted that the RFC "would also apply generally 2012–2018."  He opined that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand/walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; had

---

[58] A.R. 302–05.  Simponi is used with methotrexate to treat moderate to severe rheumatoid arthritis.  *See* https://www.simponi.com.

[59] A.R. 298–301.

limitations in the upper and lower extremities; could frequently climb ramps and ladders; climb ladders and scaffolds occasionally; balance frequently; stoop, kneel, crouch, and crawl occasionally; and had limitations reaching overhead, handling, and fingering. Dr. Caldwell noted that Plaintiff's "[r]heumatologist opined (11.7.12) that although [Plaintiff] had symptoms and hard findings of RA, they did not preclude work ("I do not see any reason that he cannot be gainfully employed in certain jobs."). I would presume this judgement would still apply inasmuch as [Plaintiff's] clinical situation waxes and wanes."[60]

On August 29, 2018, Plaintiff saw Dr. Botson. Dr. Botson noted that, since Plaintiff's last appointment, Plaintiff reported that he did not find Simponi to be helpful for his symptoms and stopped that medication after two infusions and restarted Xeljanz. Plaintiff reported that the Xeljanz was helping his joint symptoms and that he had had no medication side effects. He reported that he was using Vicodin and ibuprofen as needed for joint symptoms. Dr. Botson's review of systems was positive for generalized weakness, mouth sores, joint pain, morning stiffness, and joint swelling. On physical examination, Dr. Botson observed a cyst on the lower lip, a forearm rash, swelling in the right hand third and fourth MCPs, no discomfort or swelling in the wrists, no bilateral shoulder or right ankle pain, and normal bilateral knees. Dr. Botson noted that Plaintiff

---

[60] A.R. 385–92. Rheumatoid arthritis is a progressive disease; however, each patient's progression is unique. *See* https://www.rheumatoidarthritis.org/ra/symptoms/progression/. And, according to the CDC, there are "times when [rheumatoid arthritis] symptoms get worse, known as flares, and times when symptoms get better, known as remission." *See* https://www.cdc.gov/arthritis/basics/rheumatoid-arthritis.html.

continued to have mild inflammation and recommended increasing his dosage of Xeljanz 11mg to a level that "would technically not be FDA approved."[61]

On December 5, 2018, Plaintiff followed up with Dr. Botson. He reported consistently taking Xeljanz 11mg, but that he had not started the increased 5mg dose because he was unable to obtain a sample from Dr. Botson's office. Plaintiff reported aching in his hands and mild morning stiffness, but "not to the point where he has had difficulties completing activities of daily living." He also reported headaches, ringing in the ears, and jaw pain. On physical examination, Dr. Botson observed "very minimal swelling of the right hand third and fourth MCPs"; no swelling or discomfort in the wrists; no bilateral shoulder or right ankle pain; and normal bilateral knees. He recommended starting the increased dose of Xeljanz 5mg.[62] Plaintiff's Vectra DA score indicated moderate disease activity.[63]

On February 8, 2019, Plaintiff presented to the emergency department at Providence Alaska Medical Center with right arm joint pain. He reported developing red streaks and pain in his left arm two days previously, but in the emergency room, the red lines were no longer present. He reported feeling tender throughout the tendon of his left arm, from his bicep to his forearm, and reported cold sweats and an increased heart rate. He reported more swelling than at baseline in the right wrist. On physical examination, the attending physician observed "[g]ood passive range of motion in all major

---

[61] A.R. 401–04.

[62] A.R. 433–36.

[63] A.R. 441–42.

Case 3:19-cv-00313-SLG   Document 27   Filed 12/31/20   Page 16 of 27

joints/extremities"; no clear streaking in the right upper extremity; and swelling over the joints of the right hand and wrist, but good range of motion and no pain. Plaintiff was discharged on the same day.[64]

On February 18, 2019, Plaintiff followed up with Dr. Botson. He reported that he continued to take Xeljanz for his symptoms and intermittently increased the dose, but that he had "not been consistent with this because of concern for side effects." Plaintiff also reported, "if he misses a single dose of Xeljanz, that his symptoms do return the next day." Plaintiff also reported the development of "red streaks" on both arms and a "tightness involving the biceps tendons and pectoralis muscles" that had resolved with no return of symptoms. Dr. Botson's review of Plaintiff's systems was positive for chest pain, generalized weakness, tinnitus, abdominal pain, joint pain, muscle weakness, morning stiffness, joint swelling, headache, and paresthesia. On physical examination, Dr. Botson observed "minimal swelling of the right hand second and third MCPs and second PIP." Dr. Botson recommended that Plaintiff continue with the increased dose of Xeljanz.[65]

On March 29, 2019, Plaintiff's Vectra DA score of 38 indicated moderate disease activity.[66]

On May 7, 2019, Dr. Botson completed a work restrictions questionnaire provided by Plaintiff's attorney. Dr. Botson opined that Plaintiff's rheumatoid arthritis, specifically episodic swelling of the joints of the hands, would "make any physical or manipulative

---

[64] A.R. 448–53.

[65] A.R. 427–30.

[66] A.R. 438–39.

work difficult." He indicated that Plaintiff could perform full-time light work, but also opined that Plaintiff would be absent from work for two to three days per month "with flares that are unpredictable." Dr. Botson noted that his opinion applied to the time period from April 10, 2018 through May 7, 2019.[67]

On May 15, 2019, Dr. Botson completed a follow-up work restrictions questionnaire provided by Plaintiff's attorney. Dr. Botson opined that Plaintiff's rheumatoid arthritis would affect his hands on a frequent and severe enough basis to interfere with handling and/or fingering in a work setting for one to two times per month for one to two days per flare. Dr. Botson noted that Plaintiff had "no limitations except during flares."[68]

*Function Reports*

On June 16 and June 30, 2018, Plaintiff completed function reports. He reported living with his girlfriend and driving her to work most days, but also indicated that there were times he could not drive out of safety concerns (neck rotation and reaction time). Plaintiff reported that he woke up feeling like he was "hit by a bus." He stated that it was difficult to do physical labor when "both ankles, both wrists, most fingers, at least one elbow, and sometimes a knee is swollen and physically cannot bend/rotate/flex normally." He reported having "intense pain" moving his joints and that the pain affected his neck and shoulder rotation and his back "at times." Plaintiff indicated that he had some difficulties with personal care and that his condition affected his sleep. He also indicated that he could help prepare simple meals, do some household chores, could not do

---

[67] A.R. 426.

[68] A.R. 445–46. Because this questionnaire was a follow-up to the questionnaire from May 7, 2019, the Court assumes it applies to the same time period of April 10, 2018 to May 2019.

household repairs, did the shopping with help from his girlfriend, and could mow the lawn, but that it took him over an hour to mow a "60x40 yard." He reported helping his girlfriend care for her son and dogs. Plaintiff reported that his condition affected lifting, standing, reaching, walking, kneeling, stair climbing, completing tasks, concentration, and using his hands. He explained that he had to take multiple breaks while writing his function report, he had no strength to lift, and couldn't stand long because of his ankles.[69]

On July 1, 2018, Plaintiff's girlfriend, Alena B., completed a third-party function report. Alena B. reported that she had known Plaintiff for ten years and that Plaintiff's condition seemed "to be at its worst at this moment." She stated that Plaintiff's "swelling won't go down no matter what his doctor prescribes, he has even tried physical therapy and it seemed like it did more harm than good to his body." Alena B. reported that Plaintiff could heat up meals and do light household chores and repairs, but that the tasks took extra time to complete. She indicated that Plaintiff's condition affected his hands by limiting or preventing him from gripping. She also indicated that Plaintiff could not extend to normal limits; could not walk more than a mile; and that "tiredness and emotional stress" affected his concentration.[70]

*Hearing Testimony on June 14, 2019*

Plaintiff testified, with representation, at a hearing before ALJ LaCara on June 14, 2019. Through his attorney, Plaintiff proposed a revised onset date of December 1,

---

[69] A.R. 222–30, 237–44.

[70] A.R. 245–53.

2016.[71]  Plaintiff testified that he could have flares "a few times a week" and then he could "have nothing for a whole week, and then . . . the week after it just comes right back to pretty bad flare-ups."  He testified that his flare-ups ranged from a swollen finger joint to an entire hand or in his knees or ankles.  He indicated that the flare-ups would render his hands "basically useless"; they would impair his walking ability to its full function; his handling and fingering were affected; and that the flare-ups could last a day or several days.  Plaintiff testified that he had had problems with flare-ups since his diagnosis in 2009 and that they had always been unpredictable.  He indicated that he had had a bad reaction to Enbrel, that Simponi infusions didn't work at all, and methotrexate caused flu-like symptoms.  He testified that he took four to six Vicodin tablets each day and would usually need more during flare-ups.  He testified that he had pain, weakness, and less flexibility in his joints on a daily basis and that Vicodin helped him "do normal things."  He also testified that "[d]uring a flare-up, [I am] significantly impaired to where I can't even really try to do most things, so I just try to get through the day as best as I can."[72]

Stephen Anderson, M.D., testified as the medical expert.  He testified that his area of specialization was emergency medicine.  Based on his review of the record, Dr. Anderson opined that Plaintiff's rheumatoid arthritis was a medically determinable impairment, but it did not meet a listing.  He also opined that Plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand or walk at least two hours out of an eight-hour workday; sit six hours out of an eight-hour workday; and was

---

[71] A.R. 34.

[72] A.R. 47–58.

limited to occasional pushing and pulling in the upper and lower extremities. Dr. Anderson noted that "[i]f [Plaintiff] had a flare, it would be limited much more." He opined that Plaintiff could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. Dr. Anderson specified that, "[o]nce again that would be limited even more if he was in the middle of a flare-up" and that Plaintiff's manipulative limitations and reaching were limited only during flares. Dr. Anderson testified that overall, he agreed that Dr. Botson's medical opinion from May 2019 was consistent with the record.[73] Upon questioning by Plaintiff's attorney, Dr. Anderson testified that Plaintiff "did have frequent flares" during the relevant time period.[74]

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical,[75] VE Weiss opined that Plaintiff would be able to perform his past work as

_____

[73] A.R. 40–47.

[74] Specifically, Plaintiff's counsel stated,

"So, [Dr. Botson] does say also that he believes that [Plaintiff] would be absent from work two to three days a month because of these flares."

Counsel then asked Dr. Anderson, "So, you [are] agreeing that the claimant did have continuous flares during that time period that we're talking about?"

Dr. Anderson answered, "He did have frequent flares, yes." A.R. 46–47.

[75] The ALJ's first hypothetical was as follows:

[A]ssuming that we have an individual of the claimant's age, education, and work experience who is able to perform light work with the occasional push, pull, and foot control operation bilaterally. This person is limited to frequent climbing of ramps or stairs, and balancing, the occasional climbing of ladders, ropes or scaffolds, stooping, kneeling, crouching, and crawling. This person is limited to avoiding moderate exposure to extreme cold, wetness, humidity, excessive vibration, and is to avoid concentrated exposure to extreme heat, irritants, and hazardous machinery. A.R. 63.

a landscape foreman. He opined that Plaintiff would also be able to perform other work, including basic filler, basic assembler, garment sorter, and other light and sedentary positions. Based on the ALJ's second hypothetical,[76] VE Weiss opined that all of the jobs he previously listed would accommodate frequent reaching and handling and occasional fingering. The ALJ then asked VE Weiss if the person in the second hypothetical "miss[ed] two to three days of work a month, and these would be unscheduled absences. Would someone with these limitations and requirements still be able to do the jobs that you provided?" VE Weiss answered, "No . . . that would preclude retention of those jobs or any other employment in the national economy. In other words, they might be able to obtain the job, but not retain it."[77]

## IV. DISCUSSION

The parties' disagreement in this case focuses on the scope of the remand. Plaintiff argues that remand for the payment of benefits is appropriate and further administrative proceedings would serve no useful purpose.[78] The Commissioner agrees that remand is necessary, but contends that "there are unresolved issues and the record does not clearly require a finding of disability." The Commissioner argues that remand

---

[76] The ALJ's second hypothetical was as follows:

[A]ssume that we have an individual of the same age, education, and work experience as that of the claimant, and who is limited — or has limitations that I set out in the first hypothetical, but now we are adding wherein the — there is frequent bilateral reaching in all directions, frequent handling and fingering. A.R. 64.

[77] A.R. 66.

[78] Docket 21 at 25; Docket 26 at 2.

for further proceedings is the appropriate remedy.[79]  Specifically, the Commissioner seeks a remand order directing the ALJ to "[r]econsider the medical opinion evidence, including the opinions of Dr. Andersen and Dr. Botson."[80]

When prejudicial error has occurred, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[81] A court follows a three-step analysis to determine whether a case presents the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits.  "First, [a court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"[82] "Second, [a court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'"[83]  "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[84]   "Third, [a court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'"[85]   But, "even if all three requirements are met, [a court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record

---

[79] Docket 25 at 2.

[80] Docket 25 at 4.

[81] *Dominguez v. Colvin,* 808 F.3d 403, 407 (9th Cir. 2015) (quoting *Treichler,* 775 F.3d at 1099).

[82] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison,* 759 F.3d at 1020).

[83] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[84] *Treichler*, 775 F.3d at 1101.

[85] *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[86]

Here, the Commissioner concedes that the ALJ "committed harmful legal error in not fully addressing the opinion of treating physician John Botson, M.D., who stated in May 2019 that Plaintiff would miss 2–3 days of work per month due to his rheumatoid arthritis flares."  The Commissioner also concedes that the ALJ "mischaracterized the testimony of medical expert Stephen Anderson, M.D., who did not specifically disagree with Dr. Botson's opinion on the frequency of these flares."[87]  Thus, the parties agree that the ALJ failed to provide legally sufficient reasons for rejecting this evidence.

However, citing *Leon v. Berryhill,*[88] the Commissioner asserts that there are "unresolved issues and the record does not clearly require a finding of disability."[89] Specifically, the Commissioner alleges that the "frequency of Plaintiff's flares is the most salient issue on the issue of disability" and the medical record, "including Plaintiff's favorable response to treatment[,] calls into question the frequency of his flares."[90]

In this case, the medical record is fully developed for the period covered by Dr. Botson's opinion and Dr. Anderson's concurring testimony—April 10, 2018 through the

---

[86] *Id.* (quoting *Garrison*, 759 F.3d at 1021).

[87] Docket 25 at 2.

[88] 880 F.3d 1041, 1048 (9th Cir. 2017) (remanding for further proceedings after holding that record had not been developed thoroughly regarding claimant's fatigue.).

[89] Docket 25 at 2.

[90] Docket 25 at 4.

date of decision.[91]  The record does not support the ALJ's conclusion that Plaintiff's "symptoms only briefly worsened in May 2017 then improved with medication."[92]  To the contrary, the record supports Plaintiff's testimony that he did not improve after May 2017, but experienced side effects from some medications and had flare-ups.[93]  Laboratory results indicated moderate to high disease activity from March 5, 2018 through April 4, 2019.[94]  Further, according to the agency's rules, "increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms."[95]  Here, Dr. Botson either changed or increased the dose of Plaintiff's rheumatoid arthritis medications at office visits beginning in May 2017.[96]  Dr. Botson opined that beginning in April 2018, Plaintiff would have two to three unexcused absences from work each month due to flares; the vocational expert testified that two to three unexcused absences each month would preclude full-time work.[97]  However, Dr. Botson limited his opinions to the time period beginning April 10,

---

[91] *Treichler,* 775 F.3d at 1103.

[92] A.R. 20.

[93] A.R. 52–53, 403, 427–28.

[94] A.R. 383, 438, 440–41.

[95] SSR 96-7p, *available at* 1996 WL 374186, at *7.  Social Security Rulings (SSRs) "do not carry the force of law but they are binding on ALJs nonetheless."  *Bray v. Comm'r Soc. Sec. Admin.,* 554 F.3d 1219, 1224 (9th Cir. 2009).

[96] A.R. 322, 404, 407, 411, 430.

[97] A.R. 66.

2018.[98]  Therefore, if credited as true, Dr. Botson's flare-up opinion establishes that Plaintiff was disabled as of April 10, 2018.[99]  The Court's review of the record as a whole does not create a serious doubt that Plaintiff was disabled as of April 10, 2018.  Based on the foregoing, a remand for the calculation and award of benefits is warranted for a disability onset date of April 10, 2018.[100]

Although there is medical evidence of periodic flare-ups beginning no later than May 2017 and continuing through to April 10, 2018, the record from the alleged onset date of December 1, 2016 to April 10, 2018 is not free from inconsistencies, conflicts, or gaps and further administrative proceedings would serve a useful purpose.[101]  Accordingly, the case is remanded to the ALJ for further proceedings for the time period from Plaintiff's alleged onset date of December 1, 2016 to April 10, 2018.  On remand, the ALJ should reconsider Plaintiff's testimony, Dr. Anderson's opinions, and Dr. Botson's opinions in light of the medical record and consider eliciting testimony, interrogatories, or other clarification of the evidence for the time period before April 10, 2018.

## V.  ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were not free from legal error.  Accordingly, IT IS ORDERED that

---

[98] *See* A.R. 426.

[99] A.R. 25, 426, 445–46.

[100] The Court acknowledges that the time period covering Plaintiff's award of immediate payment of benefits may further be limited by statute or regulation. *See e.g.,* Titles II and XVI of the Social Security Act; 20 C.F.R. §§ 404.130, 404.131, 404.315, 416.335.

[101] *Dominguez*, 808 F.3d at 410.

Plaintiff's request for relief at Docket 21 is GRANTED IN PART as set forth herein, the Commissioner's final decision is VACATED, and the case is REMANDED for the calculation and award of benefits based on a finding of disability commencing on April 10, 2018 and REMANDED for further proceedings consistent with this Decision and Order for the time period before April 10, 2018 as set forth above.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 31st day of December, 2020 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE